Cite as 2023 Ark. App. 135

# ARKANSAS COURT OF APPEALS
## DIVISION III
### No. CV-22-633

|  |  |
|---|---|
| MARISSA VALENTIN<br><div align="right">APPELLANT</div> | Opinion Delivered March 8, 2023 |
| V. | APPEAL FROM THE PULASKI COUNTY CIRCUIT COURT, EIGHTH DIVISION<br>[NO. 60JV-22-241] |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN<br><div align="right">APPELLEES</div> | HONORABLE TJUANA C. BYRD, JUDGE<br><br>AFFIRMED |

**STEPHANIE POTTER BARRETT, Judge**

Marissa Valentin appeals the Pulaski County Circuit Court's order adjudicating her four children dependent-neglected, arguing that there is insufficient evidence to support a finding of dependency-neglect.[1] We affirm the circuit court's determination.

DHS filed a petition for ex parte emergency custody and dependency-neglect on April 7, 2022, against Marissa and Ustavo Valentin.[2] DHS alleged that a seventy-two-hour hold was taken on April 4 because the children were at substantial risk of serious harm as a result of physical abuse, neglect, and parental unfitness resulting from an altercation in which

---

[1]An adjudication order in a dependency-neglect case is an appealable order. Ark. Sup. Ct. R. 6-9(a)(1)(A) (2022).

[2]Ustavo and Marissa are married, but Ustavo lives in Connecticut, and he is not a party to this appeal.

Marissa struck MC2 and threatened bodily harm to all the children. An ex parte order of emergency custody was entered the same day. A probable-cause order was entered after a hearing on April 12, finding probable cause to continue custody of the children with DHS because the emergency conditions that necessitated removal persisted, and the juveniles could not be safely returned to Marissa due to the volatility in the home and the unsafe environment. An adjudication order was filed on July 26, adjudicating the children dependent-neglected; Marissa timely appeals from that order.

At the adjudication hearing, fifteen-year-old MC2 testified that on April 4, she was in the apartment with her siblings (MC1, MC3, and MC4) and Marissa, who was drinking alcohol and taking medication. MC2 explained that when Marissa drank alcohol, she became more violent, destructive, and verbally and sometimes physically abusive. According to MC2, Marissa left the apartment at some point for a short time; when she came back, she seemed angrier and more upset; she began yelling and cursing at MC2 and her siblings; and she told them that she "might as well just kill [them] all" in their sleep. MC2 testified that Marissa began yelling insults at her, pulling her hair, punching her in the face, and kicking her arms and legs, leaving her with a mark on her forehead and a sore jaw; during the altercation, Marissa also retrieved a kitchen knife and lunged toward MC2's face with it. MC2 stated it was not the first time Marissa had acted in such a manner toward her or her siblings. MC2 testified that she and her younger sister were so scared that they locked themselves in their bedroom, opened the window, broke the screen, jumped from the second-floor apartment window to the ground, found police officers, and told the officers

that Marissa was trying to kill them. MC2 said that Marissa blamed her for her grandfather's death and for her and her siblings being in DHS custody. MC2 did not feel that it was safe to return to Marissa's home; she did, however, feel safe with Ustavo, and if given the choice, she stated that she would prefer to live with him.

On cross-examination, MC2 admitted that, while in a prior foster-care placement, she had started a fight with her brother, injuring his head and causing him to go to the hospital; this behavior resulted in the children's removal from the first placement to their current placement. She acknowledged her two stays in a psychiatric hospital, once for suicidal ideations and attacking Marissa and again for violent behavior. She conceded that she had written a suicide note in April 2022 as well as a note about killing her grandfather shortly before he passed away because he was trying to have the children placed with him.

Tamara Jones, the family-service caseworker, testified that she received the report of Marissa's attempt to harm the children on April 4, and investigated it that day; interviews with MC1, MC3, and MC4 revealed the same facts as MC2 had provided regarding the April 3 incident. Jones also interviewed Marissa, who admitted that she had told MC2 she was "being disrespectful as hell," that she had "popped" MC2 in the mouth with her hand several times and had pulled her hair, and that she had grabbed a knife and told MC2 that she was going to "f**k her a** up"; however, Marissa denied kicking MC2. Marissa indicated to Jones that MC2 had previously been disrespectful to Marissa's father and had pulled a knife on him.

On cross-examination, Jones opined that there were not any services DHS could provide to prevent the removal of the children because Marissa had threatened to harm them on more than one occasion, and they were fearful of returning to Marissa's home because they believed Marissa would make good on her threat to kill them in their sleep. Jones admitted that Marissa was not arrested at the time of the incident because the police officers believed the children's stories were inconsistent, and the children were not taken to the emergency room after the incident, even though two of them had jumped out of a second-story window.

Ustavo testified that he lives in Connecticut and has sufficient space and furniture for the children to live with him. He recounted that Marissa pulled a knife on him in 2017 or 2018 in front of the children, and he had to run for his life; he believed the past was repeating itself. While he was currently still married to Marissa, he intended to divorce her. Ustavo admitted that he had been convicted of assault in 1996 and had gone to prison on a parole violation in that case in 2001, but he denied that he was currently on parole or that his girlfriend has a criminal history. Ustavo asserted that he would be able to care for the children if they were to come live with them, and he was prepared to provide them with therapy or counseling if it was necessary, including assistance with any mental-health issues MC2 might have.

Brooke Gillum, the family-service-worker supervisor, testified that DHS was doing background checks and a home study for Ustavo, and it was arranging individual counseling, a drug-and-alcohol assessment, drug-and-alcohol screens, a psychological evaluation, and

family counseling, if possible, for Marissa. The children were being referred for counseling and comprehensive health assessments to ensure their medical needs were being met. Gillum recommended that the children remain in DHS custody because the reasons for removal had not been remedied; the children were still fearful of Marissa; and they were not presently comfortable returning home with her.

Marissa testified that MC2 began having mental-health issues at age five, starting with behavioral issues and progressing to aggression toward her older brother. She said that in 2011, after MC2 split MC1's head open with a toy truck, she sought help for MC2, who was diagnosed with a mood disorder and ADHD. After moving to Arkansas in 2017, MC2 was treated at Pinnacle Pointe in 2018 for psychiatric issues after hitting Marissa in the face, and she was again diagnosed with a mood disorder and ADHD. Marissa admitted that Ustavo had left after she pulled a knife on him in 2017 or 2018, and he never returned. Marissa believed the children could be safely returned to her at the adjudication hearing; she denied disciplining her children, claiming that she had never hurt them. However, she admitted that she had hit the children with a belt on one occasion, but she did not like how that made her feel, so she did not continue to do it. Marissa denied that she grabbed a knife and told MC2 that she was going to f**k her a** up; she claimed that she grabbed the knife so that MC2 could not get it. Marissa claimed that, because of MC2's violent history, she was afraid for her life on the night the children were removed, which was why she tried to stop MC2 from picking up the knife.

Finding the testimony of MC2 and Jones to be credible, the circuit court adjudicated the children dependent-neglected based on abuse and parental unfitness. The court described the household as unstable and toxic, and while stating that parenting can at times be very challenging, it was "pretty clear there was more than a verbal altercation." The court noted that any situation causing children to believe that their best means of safety was to jump out of a second-story window sounded like a dangerous situation.

An adjudication order finding the children dependent-neglected based on Marissa's abuse and parental unfitness was entered on July 26, 2022. The order recited that the evidence established Marissa had struck MC2 with a closed fist and had repeatedly hit and kicked MC2 while she was on the ground, leaving MC2 with bruising on her forehead and a sore jaw; that Marissa had threatened to kill the children while they slept, and they were afraid she would do so; that the children had barricaded themselves in their room and jumped out of a second-story window to get away from Marissa; and that the children's recollections of the event when interviewed by Jones were consistent. The circuit court found that a fit parent would not strike a child repeatedly or act the way Marissa acted when dealing with conflict in the home and that Marissa's actions had placed the children at substantial risk of serious harm. While the circuit court found MC2's and Jones's testimony credible, it found Marissa's testimony was not credible.

A dependent-neglected juvenile is one at substantial risk of serious harm as a result of, among other things, abandonment, abuse, neglect, or parental unfitness committed against the juvenile, a sibling, or another juvenile. *Gabel v. Ark. Dep't of Hum. Servs.*, 2022

6

Ark. App. 489, 656 S.W.3d 8. Adjudication hearings are held to determine whether the allegations in a dependency-neglect petition are substantiated by proof; the focus of an adjudication hearing is on the child, not the parent, as the juvenile code is concerned at this stage of the proceeding with whether the child is dependent-neglected. *Id.* Dependency-neglect allegations must be proved by a preponderance of the evidence. *Id.* In reviewing dependency-neglect adjudications, this court conducts a de novo review on appeal, but we do not reverse the circuit court's findings unless they are clearly erroneous or clearly against the preponderance of the evidence. *Franklin v. Ark. Dep't of Hum. Servs.*, 2022 Ark. App. 390, 654 S.W.3d 76. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court is left with a definite and firm conviction that a mistake has been made. *Id.* In reviewing a dependency-neglect adjudication, we defer to the circuit court's evaluation of the credibility of the witnesses. *Id.* Only one ground is necessary to support a dependency-neglect finding. *Id.*

On appeal, Marissa argues that the factual history and the evidence presented at the adjudication hearing did not support the circuit court's conclusion that she abused her children or that she is an unfit parent. We disagree. Abuse is defined in the juvenile code, as is pertinent to the facts of this case, as an act by a parent of "(v) Any nonaccidental physical injury: (vi) Any of the following intentional or knowing acts, with physical injury and without justifiable cause: . . . (b) striking a child with a closed fist; . . . or (d) striking a child on the face[.]" Ark. Code Ann. § 9-27-303(3)(A)(v), (vi)(b) and (d) (Supp. 2021). While "parental unfitness" is not defined in the juvenile code, case law is clear that such a finding is not

7

necessarily predicated on the parent's causing some direct injury to the child in question because the juvenile code's paramount concern is protecting dependent-neglected children in general. *Johnson v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 513, 611 S.W.3d 240.

The majority of Marissa's argument centers on the circuit court's finding that MC2 and Jones were credible witnesses regarding the events of April 3, 2022. Marissa points out that MC2 has a history of violent behavior, including violent behavior toward Marissa and MC2's older brother. She also questions Jones's opinion that the children's recollections of the altercation were consistent because the police officers who were present on April 3 believed the children's stories were inconsistent. But credibility of witness testimony is for the circuit court to determine, *Franklin*, *supra*, and this court will not reweigh the evidence or the credibility determinations made by the circuit court. Here, much of Marissa's and MC2's testimony was diametrically opposed; the circuit court was free to determine that MC2's and Jones's testimony was more credible than Marissa's testimony.

Marissa also argues that DHS failed to produce any photographic evidence to corroborate MC2's testimony that Marissa had repeatedly beaten and kicked her. DHS was not required to produce photographic evidence of any injuries; MC2's testimony provided sufficient evidence of the injuries. Furthermore, Marissa herself admitted that she "popped" MC2 in the mouth for being disrespectful.

We hold that there is sufficient evidence to support a finding of dependency-neglect under both abuse and parental unfitness, although only one finding is necessary to support a finding of dependency-neglect. *Franklin*, *supra*. The abuse finding is supported by MC2's

8

testimony that Marissa struck her in the face with her fist, leaving her with a sore jaw and a bruise on her forehead, and Marissa's admission that she had "popped" MC2 in the face for being disrespectful. As for parental unfitness, we hold that lunging at your fifteen-year-old daughter with a kitchen knife and telling your children that you are going to kill them in their sleep supports the unfit-parent finding because a fit parent would not threaten her children in this manner. *See Clary v. Ark. Dep't of Hum. Servs.*, 2014 Ark. App. 338 (threats of harm to the children can support a finding of parental unfitness).

Affirmed.

ABRAMSON and GRUBER, JJ., agree.

*Jennifer Oyler Olson*, Arkansas Commission for Parent Counsel, for appellant.

*Kaylee Wedgeworth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor children.